# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RONALD COLLINS,

     Plaintiff

v.

JOSHUA COLLINS, et. al.,

     Defendants

Case No.: 3:16-cv-00111-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 126 &
ECF No. 181 (Count IV only)

     This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Plaintiff's Motion for Summary Judgment as to Count IV. (ECF No. 126 and suppl. at ECF Nos. 179, 223.) Count IV is a due process claim based on allegations that Plaintiff was placed into a security threat group (STG) and validated as a white supremacist without receiving a hearing to contest the designation which resulted in his being housed in administrative segregation for years. Defendants filed a response and counter-motion to dismiss Count IV. (ECF Nos. 158, 158-1 to 158-3). They assert a statute of limitations argument as well as arguments going to the merits of the claim. Plaintiff filed a reply in support of his motion/response to the counter-motion to dismiss. (ECF No. 163.) Defendants filed a reply to Plaintiff's response to their counter-motion to dismiss. (ECF No. 165.) Plaintiff filed a supplemental declaration and supplemental exhibits. (ECF No. 179, 223.)

     Plaintiff moved to strike pages 1-4 of Exhibit C to Defendants' response/counter-motion. (ECF No. 162.) The court entered a separate order denying that motion. (ECF No. 233.)

Defendants moved to strike Plaintiff's supplement at ECF No. 179. (ECF No. 199.) The court has entered a separate order denying that motion. (ECF No. 233.)

Defendants have also filed a Motion for Partial Summary Judgment. (ECF No. 181.) This Report and Recommendation will only address the portion of that motion pertaining to Count IV because the counter-motion to dismiss and motion for partial summary judgment contain arguments that overlap with respect to Count IV. The court will issue a separate report and recommendation with respect to the arguments made in ECF No. 181 as to the claims in Counts I and III.

Plaintiff's response to Defendants' motion for partial summary judgment is set forth at ECF No. 193. He also filed a supplement concerning Count IV. (ECF No. 198.) Defendants moved to strike the supplement. (ECF No. 213.) The court issued a separate order denying the motion to strike. (ECF No. 234.)

After a thorough review, it is recommended that: (1) Defendants' counter-motion to dismiss should be converted to a motion for summary judgment because it relies on evidence outside of the pleadings; (2) to the extent Defendants' motions (ECF No. 158 and ECF No. 181) argue that Count IV is barred by the statute of limitations, the motions should be granted in part and denied in part; (3) Plaintiff's motion for summary judgment on the merits (ECF No. 126) should be granted in part and denied in part; and, (4) Defendants' motion for summary judgment on the merits should be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 20.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada

Correctional Center (NNCC), Lovelock Correctional Center (LCC), and Warm Springs Correctional Center (WSCC). (*Id.*) Defendants are Dr. Romeo Aranas, Isidro Baca, Joshua Collins, Dwayne Deal, NDOC Assistant Director Sheryl Foster, Dr. Karen Gedney, Joel Hightower, Silvia Irvin, Dillyn Keith, Robert LeGrand, Dr. David Mar, E.K. McDaniel, Holly Skulstad, and Lisa Walsh. Julie Rexwinkle has been dismissed without prejudice. (ECF No. 232.)

Insofar as these motions are concerned, Plaintiff was allowed to proceed on screening with a due process claim in Count IV of the amended complaint against LeGrand, McDaniel, Baca, Keith, Deal, Walsh, Irvin, Foster, Rexwinkle (now dismissed without prejudice) and Skulstad. Plaintiff alleges that he was designated STG and validated as a white supremacist without a STG due process hearing which resulted in him being housed in administrative segregation for years. (ECF No. 8 at 15, 19, 20-2 at 1-10.) He avers that once he was advised of the STG designation, he continually requested a STG due process hearing via kites and grievances, to no avail. He maintains that he is not a white supremacist, and is not affiliated with any gang. In response to many of his grievances Defendants acknowledged he should have received a due process STG hearing; however, as of the time he filed his original complaint in February of 2016, he still had not been given an STG hearing. He alleges that his claim falls under the continuing violation doctrine because he was classified by NDOC officials every month as a STG member from the time he was designated as STG.

Plaintiff moves for summary judgment with respect to Count IV on the grounds that there is no dispute of material fact and he is entitled to judgment as a matter of law because he was

denied a STG due process hearing.[1] Defendants respond that Plaintiff's classification status was

reviewed sixteen times between 2013 and 2015, and argue Plaintiff's claim in Count IV is barred

by the statute of limitations. Defendants assert the same arguments in their motion for summary

judgment as to Count IV, and also argue that they cannot be liable for responding to grievances,

and Plaintiff may not recover monetary damages against Defendants in their official capacities.

## II. LEGAL STANDARD

Defendants filed a counter-motion to dismiss Count IV on the basis that the claim is

barred by the statute of limitations. Their argument relies on evidence outside of the pleadings

(an inmate request form (also referred to as a kite) and several grievances). Their motion for

partial summary judgment also argues that Count IV is barred by the statute of limitations.

Curiously, that portion of the motion for *summary judgment* also cites the motion to dismiss for

failure to state a claim standard and relies on evidence outside of the pleadings.

The court may only consider allegations in the pleadings, exhibits attached to a pleading,

and matters properly subject to judicial notice in ruling on a motion to dismiss for failure to state

a claim without converting it to a motion for summary judgment. *See Swartz v. KPMG LLP,* 476

F.3d 756, 763 (9th Cir. 2007) (per curiam); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th

Cir. 2001). Since Defendants cite the motion to dismiss standard in both motions and rely on

materials outside of the pleadings, the court will convert their request for dismissal of Count IV

to one for summary judgment. Plaintiff was on notice of the requirements for opposing a motion

for summary judgment. (*See Klingele* order at ECF No. 185.)

---

[1] Plaintiff also argues that he is entitled to summary judgment because Defendants failed to
answer Count IV, and therefore, it is admitted under Federal Rule of Civil Procedure 8(b)(6);
however, after this motion was filed, the court allowed Defendants to belatedly file an answer as
to Count IV. (ECF No. 155.) Therefore, this argument is moot.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

(quotation marks and citation omitted). "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary

judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*.

Instead, the opposition must go beyond the assertions and allegations of the pleadings and set

forth specific facts by producing competent evidence that shows a genuine dispute of material

fact for trial. *Celotex*, 477 U.S. at 324.

At summary judgment, the court's function is not to weigh the evidence and determine

the truth but to determine whether there is a genuine dispute of material fact for trial. *See*

*Anderson*, 477 U.S. at 249. While the evidence of the nonmoving party is "to be believed, and all

justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

50 (citations omitted).

### III. DISCUSSION

**A. Statute of Limitations**

**1. Summary of Argument**

Defendants argue that Plaintiff admits he knew of his STG designation in December of

2008, and requested a debriefing regarding his STG status on January 6, 2009, but he waited

over two and a half years (until August 29, 2011) to file a grievance on the issue, and did not file

this lawsuit until February 26, 2016; therefore, his claim is time-barred. (ECF No. 158 at 5-7;

ECF No. 165 at 2-3; ECF No. 214 at 12-13.)

Plaintiff argues that he alleged this as a continuing violation because he was classified by NDOC as STG without a due process hearing every month such that a new due process violation occurred every time he was classified without a hearing. (ECF No. 163 at 2-3; ECF No. 193 at 31.)

Defendants maintain that the subsequent classification decisions were a consequence of the original STG decision, and a continuing impact from a past constitutional violation is not actionable. (ECF No. 165 at 3.)

**2. Factual Background**

The following facts are not in dispute:

NDOC Administrative Regulation (AR) 446 governs the identification of inmates affiliated with STG and disruptive groups. (*See* ECF No. 126 at 42-47.)[2] It provides that the Inspector General's (IG) Office has primary responsibility to supervise the process for identification and management, including validation, of STG and affiliated inmates. When STG activity is suspected, the warden or his/her designee initiates an inquiry to gather relevant information, and when appropriate the IG designee will validate the inmate. An inmate will be notified of suspected STG affiliation via an NDOC form, and is to be advised of the necessary steps to remove themselves from affiliation through a formal debriefing process. If the inmate disagrees with the designation, he has 10 days from the time he receives the written notification to submit a request in writing via his caseworker for a STG due process hearing.

---

[2] The version of AR 446 submitted by Plaintiff has an effective date of March 19, 2013. This was not the version in effect when Plaintiff was originally and subsequently validated STG; however, it was in effect for the time period at issue in this litigation when he was requesting a STG due process hearing.

The involved caseworker is required to notify the supervisory caseworker staff of the request for a hearing, and the request is supposed to be documented in NDOC's NOTIS system. The STG due process hearing panel consists of the warden or his/her designee, the inmate's caseworker and one other staff member.

During regular reviews, casework staff are required to confirm with the inmate any validated STG designation, and if an inmate expresses an interest in debriefing and having the STG designation removed, he is to be referred to the IG's Office, with notification to the associate warden for tracking purposes. The investigation and follow up may be assigned to a staff member within the institution or to the IG's designee. The matter will be assigned for review by an investigator within 60 days. The IG's designee will review the staff member's recommendation.

Plaintiff was initially designated STG and validated as a white supremacist in 2006 or 2007.[3] He became aware of the designation on December 19, 2008, through a disciplinary notice of charges dated December 18, 2008. (ECF No. 126 at 6, 14, 22, 30.) Shortly thereafter, on January 6, 2009, Plaintiff sent a kite to his caseworker—Emmanuel— stating that he was told he needed to talk to Emmanuel about a debriefing to get the STG validation removed, because he never knew he was listed as a gang member and had not been in a gang. He received a response that he would be added to the list. (ECF No. 158-1 at 2.)

---

[3] Grievance responses in 2011 and 2015 state that Plaintiff was validated as a white supremacist in 2007. (*See* ECF No. 126 at 38, 66.) A 2016 grievance response states that Plaintiff was validated as a white supremacist for the first time in 2006, and was re-validated by the Inspector General's Office in 2012. (*Id*. at 96.) Plaintiff claims the write up he received stated he was validated in 2006. (ECF No. 126 at 5 ¶ 1.) Regardless of when the validation originally occurred, Defendants do not appear to dispute Plaintiff did not become aware of the initial validation until December of 2008.

Over two and a half years later, on August 20, 2011, Plaintiff sent a kite to Emmanuel stating that according to a write up he received in 2008 he was listed as a white supremacist, but he disputed having been in a gang. He indicated that he should have been given a STG due process hearing and asked that the designation be removed or that he be provided with a STG due process hearing. Emmanuel responded on August 25, 2011, that Plaintiff was on the list for a hearing.  (ECF No. 126 at 32.)

Plaintiff filed grievance 2006-29-29198 on August 29, 2011, asking for a hearing on his STG designation. (ECF No. 126 at 39-40.) Ward responded to the informal level grievance, stating that Plaintiff was validated as a white supremacist on June 5, 2007, and he had 10 days to appeal a STG validation, and he had not requested to appeal that decision. (*Id*. at 38.) LeGrand responded to the first level grievance, and advised Plaintiff that he had directed that Plaintiff be seen at the next STG due process hearing. (*Id*. at 36.) McDaniel responded to the second level grievance, reiterating that Plaintiff would be scheduled for a STG due process hearing. (*Id*. at 34.)

Plaintiff apparently did not get a STG due process hearing, and sent a kite to Oxborrow on February 10, 2013, and asked about getting his STG designation removed. He was told a debriefing would not remove a STG designation. (*Id*. at 77.) On February 13, 2013, he asked how he could challenge his STG designation, as he had never been given a hearing. He was told to request a STG due process hearing via kite. (*Id*. at 80.) He sent a kite on November 17, 2013, to Keith, advising he never had a hearing after being validated as STG. He also asked who had validated him. The response stated: "The IG's Office on 3/02/12." (*Id*. at 76.)

On June 15, 2014, Plaintiff submitted grievance 2006-29-80556, stating that he had received an administrative segregation classification notice every month that he was labeled STG

for prison gang affiliation, even though he had pleaded with the administration that he was not a gang member, and had asked for a hearing, to no avail. (*Id*. at 92-93.) Keith responded to the informal level grievance stating that Plaintiff was reviewed for general population at NNCC and was denied "due to RFS" (presumably referring to his risk factor score). (*Id*. at 91.) To the extent he wanted a due process hearing for his STG affiliation, Keith instructed him to kite his caseworker and he would be added to the hearing list. (*Id*.) Baca responded to the first level grievance and instructed Plaintiff (who was then at Warm Springs Correctional Center (WSCC)) to consult a caseworker to address his issues. (*Id*. at 89.) Deal responded to the second level grievance, stating Plaintiff was back at NNCC for medical reasons and housed in administrative segregation due to his STG validation. Deal instructed NNCC staff to review him for appropriate housing. Deal acknowledged Plaintiff's statement that he had been asking for a due process hearing for six years, but said that Plaintiff should have requested a hearing within 10 days of being notified of his validation. To the extent Plaintiff claimed he was never notified of the validation, Deal said if Plaintiff submitted a written request for a hearing, he was sure NNCC staff would be willing to schedule one. (*Id*. at 85.)

Plaintiff sent a kite on March 29, 2015, asking to be put on the list for classification, but was told on April 7, 2015, that he could not go to general population because of his STG issues. (*Id*. at 72.)

On April 14, 2015, he filed grievance 2006-29-98664, stating that he had been denied a STG hearing after being designated a white supremacist. (*Id*. at 16, 62-68.) He indicated that around April 7, 2015, he had asked his caseworker, Rexwinkle, for a STG due process hearing, and she told him to file a grievance. (*Id*. at 67-68.) Irvin responded to the informal level grievance stating that Plaintiff had been validated as a white supremacist in 2007, and was

10

outside the time frame to appeal the validation. (*Id*. at 66.) Baca responded to the first level grievance, stating that Plaintiff was outside the timeframe to contest the 2007 validation. (*Id*. at 64.) In his second level grievance, Plaintiff indicated he was never informed of the designation and could not have requested a hearing. (*Id*. at 63.) Foster responded to the second level grievance and directed Warden Baca to have Plaintiff scheduled for a classification committee hearing to discuss his STG status. (*Id*. at 62.)

In a May 7, 2015 kite, he asked to go to general population, and Walsh responded he could not because of his affiliation. (*Id*. at 73.) He sent another kite to Walsh on May 11, 2015, stating he was not a gang member and he never had an STG hearing. Walsh responded that there was a new warden and things had changed. (*Id*. at 74.) He sent a kite to Rexwinkle on May 11, 2015, requesting a full STG hearing, and does not appear to have received a response. (*Id*. at 75.)

Plaintiff sent another kite on December 31, 2015, asking if Baca would let him onto the general population yard, and was told by Skulstad that this was denied by Baca, but that he would be reviewed for appropriate placement. (*Id*. at 78.) Plaintiff sent a kite to Baca on September 13, 2016, and requested a classification hearing. He was told to start with his unit caseworker. (*Id*. at 81.)

On January 10, 2016, he filed grievance 2006-30-15344, stating he had been classified as STG without a hearing. (*Id*. at 97-101.) Skulstad responded to the informal level grievance (dated February 4, 2016), stating that Plaintiff was listed as a white supremacist for the first time in 2006, and was re-validated by the IG's Office in 2012. She confirmed that it appeared he had not been provided a STG due process hearing, and instructed him he could request a hearing through the Institutional Investigator at WSCC. (*Id*. at 96.) The grievance was upheld. (*Id*.)

Plaintiff filed his application to proceed in forma pauperis and pro se complaint on February 26, 2016. (ECF Nos. 1, 1-1.)

A March 21, 2016 memorandum from Ward to Plaintiff advised that a STG due process hearing was scheduled for March 31, 2016. (*Id*. at 103.) The hearing did in fact take place on March 31, 2016, before panel members Ward, Skulstad, and Moyle. They decided that the matter needed further investigation, and Plaintiff was advised he could appeal. (*Id*. at 104.)

Plaintiff filed grievance 2006-30-21185 on March 31, 2016, stating that he had requested a STG hearing for nine and a half years and finally received it on March 31, 2016, but asserted that the panel did not submit evidence to establish he was a gang member but recommended an investigation. He asked to be taken off the STG list. (*Id*. at 111-113.) Skulstad responded stating that the Inspector General's Office would make the final determination. (*Id*. at 110.) Baca responded at the first level, and advised Plaintiff that the matter was being investigated further and Plaintiff had 10 days to appeal the panel decision. (*Id*. at 108.) Byrne responded to the second level grievance, and upheld the grievance, confirming that Plaintiff 's STG validation had been removed in June of 2016. (*Id*. at 106.)

Plaintiff filed grievance 2006-30-21270, on March 31, 2016, stating that he was classified as STG without a hearing, and that he had found out about the designation in 2008, and had been requesting a hearing ever since. He finally received a hearing on March 31, 2016, and the panel recommended an investigation even though there was no evidence presented of any gang affiliation. At the second level, he was advised again that the STG designation had been removed. (*Id*. 117-124.)

Plaintiff sent a kite to Ward on August 12, 2016, asking if his STG designation had been removed, and Ward responded the next day that it had. (*Id*. at 115.)

1    Plaintiff was reviewed for classification from administrative segregation to general

2  population periodically between 2013 and 2016, but classification to general population was

3  either denied or deferred due to his STG status. (*See* ECF Nos. 126 at 70, 158-3, 183-4, 198 at

4  59, 223 at 5-60.)[4] His STG designation as a white supremacist was not the subject of a due

5  process *hearing* until March 31, 2016. (ECF No. 126 at 104.)

6      **3. Statute of Limitations in 1983 Actions Filed in Nevada**

7    Section 1983 does not contain its own statute of limitations; therefore, federal courts

8  borrow the statute of limitations for section 1983 claims applicable to personal injury claims in

9  the forum state. *See Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985); *Pouncil v. Tilton*, 704 F.3d

10  568, 573 (9th Cir. 2012). In Nevada, the statute of limitations for personal injury claims, and

11  therefore section 1983 actions brought here, is two years. Nev. Rev. Stat. 11.190(4)(e); *see also*

12  *Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir. 1989).

13    "A statute of limitations begins to run on the date on which the plaintiff's claim

14  'accrues.'" *Pouncil*, 704 F.3d at 573 (citation omitted). "Federal law determines when a cause of

15  action for a Section 1983 claim accrues and, hence, when the statute of limitations begins to

16  run." *Id.* (citation omitted). Under federal law, a claim accrues "when the plaintiff knows or has

17  reason to know of the injury that is the basis of the action." *Id.* at 574 (citation omitted).

18    Federal courts apply the forum state's law regarding tolling, including equitable tolling,

19  when not inconsistent with federal law, to civil rights claims filed under section 1983. *Johnson v.*

20

21  ───────────────
[4] The record contains classification results notices denying or deferring a classification move
22  from administrative segregation to general population due to STG issues on: January 25, 2013,
    February 21, 2013, March 21, 2013, April 26, 2013,  March 14, 2014, April 18, 2014, May 15,
23  2014, June 19, 2014, July 21, 2014, September 19, 2014, October 24, 2014, November 26, 2014,
    December 24, 2014, January 28, 2015, November 16, 2015, December 7, 2015. (ECF No. 158-3;
    ECF No. 223; ECF No. 183-4.)

13

1    *State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000) (citations omitted). "[T]he applicable statute of

2    limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown*

3    *v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005) (citations omitted); *see also Soto v. Sweetman*,

4    882 F.3d 865 (9th Cir. 2018), *cert. denied*, 139 S.Ct. 480 (Nov. 13, 2018) (inmate is "entitled to

5    tolling while … actively exhausting his remedies[.]").

6        **5. The Supreme Court Has Substantially Limited the Continuing Violation Doctrine**

7        Plaintiff alleges that his claim is not time-barred because it is a continuing violation as he

8    was classified by NDOC as STG without a due process hearing every month.

9        Defendants contend that a mere continuing impact from past violations is not actionable.

10   They argue that the operative act from which the statute of limitations began to run was the

11   initial notification of his STG status in December of 2008.

12        The amended complaint does not specifically identify the original STG validation or the

13   March 2012 STG validation as a basis for his claims. The amended complaint does reference

14   grievances that were filed from 2011 forward, and Plaintiff does briefly state that his injuries

15   should be calculated from the time of the original designation. Construing the complaint

16   liberally, it appears Plaintiff is challenging the failure to provide him with a due process hearing

17   over the entire timeframe.

18        With this in mind, the court will attempt to clarify the viability of the continuing

19   violations doctrine, and will then apply the current legal framework to the facts of this case.

20        The Ninth Circuit had applied the continuing violation doctrine to section 1983 actions

21   and allowed "a plaintiff to seek relief for events outside of the limitations period" when the

22   actions involved were closely enough related to constitute a continuing violation and one or more

23   of them fell within the statute of limitations period. *See Knox v. Davis*, 260 F.3d 1009, 1013 (9th

14

Cir. 2001) (citing *Gutowsky v. County of Placer,* 108 F.3d 256, 259 (9th Cir. 1997) (applying the continuing violation doctrine to a section 1983 claim of employment discrimination against a municipality when there is a series of related acts against an individual, or a systematic policy or practice of discrimination, and one of the acts falls within the limitations period); *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir. 1982) ("a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period")).

A plaintiff could not apply the continuing violation doctrine to a "mere continuing impact from past violations[.]" *Id*. (citations, quotation marks, and emphasis omitted). In *Knox*, the plaintiff was a criminal defense attorney whose prison visitation and legal mail privileges were withdrawn. She received the letter withdrawing her privileges on January 20, 1996. She argued the continuing violation doctrine allowed her to file her action outside of the one-year statute of limitations because a new claim arose each time she was denied visitation or mail privileges. The Ninth Circuit disagreed, finding that the subsequent denial of the visitation and  mail privileges were "merely the continuing effect of the original suspension." *Id*.

The year after *Knox* was decided, the Supreme Court decided *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002). *Morgan* involved a claim of employment discrimination lodged with the Equal Employment Opportunity Commission (EEOC). *Morgan* characterized the Ninth Circuit's application of the continuing violation doctrine as "allow[ing] courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent[ed] an ongoing unlawful employment practice." *Morgan*, 536 U.S. at 107 (citation and quotation marks omitted). The Court described that in the Ninth Circuit, there were two ways to establish a continuing violation. First, the plaintiff could demonstrate "a

1  series of related acts one or more of which [we]re within the limitations period" and the acts

2  "occurring prior to the limitations period [we]re sufficiently related to those occurring within the

3  limitations period" and the incidents were not "isolated, sporadic, or discrete." *Id.* (citations and

4  quotation marks omitted). Second, the plaintiff could show "a systematic policy or practice of

5  discrimination that operated, in part, within the limitations period—a systemic violation." *Id.*

6  (citations and quotation marks omitted).

7      The Supreme Court held that "discrete discriminatory acts are not actionable if time

8  barred, even when they relate to acts alleged in timely filed charges." *Id.* at 113. Instead, "[e]ach

9  discriminatory act starts a new clock for filing charges alleging that act." *Id.* "The existence of

10  past acts and the employee's prior knowledge of their occurrence, however, does not bar

11  employees from filing charges about related discrete acts so long as the acts are independently

12  discriminatory and charges addressing those acts are themselves timely filed." *Id.* Based on these

13  conclusions, the Court reversed the Ninth Circuit's holding that as long as one act fell within the

14  limitations period, acts that were sufficiently related could also be considered. *Id.* at 114. The

15  Supreme Court instructed that each "incident of discrimination and each retaliatory adverse

16  employment decision" was separately actionable, and the plaintiff could only sue over those

17  discrete acts that occurred within the limitations period. *Id.*[5] The Court specifically reserved the

18  question of timeliness of a "pattern or practice claim." *Id.* at n. 9.

19      In *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003), the Ninth Circuit discussed the

20  application of *Morgan* to claims brought by employees of the United States Postal Service

21

22  [5] The Court viewed hostile work environment claims differently because "[t]heir very nature
   involves repeated conduct. *Id.* at 115. The Court held that a hostile work environment claim it is

23  not time barred "so long as all acts which constitute the claim are part of the same unlawful
   employment practice and at least one act falls within the time period." *Id.* at 122.

alleging that their rights under the Rehabilitation Act were violated when their requests for respirators were denied. The employees initially requested the use of a respirator in October of 1994, and their request was denied under the Postal Service's policy prohibiting respirators unless air contaminants exceeded certain limits set by OSHA. *Cherosky*, 330 F.3d at 1244. The employees contacted the EEOC in August of 1997 and filed complaints in September and October of 1997. In 1998, they filed suit. *Id*. Federal regulations required the employee to consult an EEOC counselor for informal resolution before filing suit within 45 days "of the date of the matter alleged to be discriminatory." *Id*. at 1245. The employees conceded that they did not contact EEOC counselors within 45 days of the date their requests to wear respirators were denied, and that their claims were based on conduct outside of the 45-day period. *Id*. at 1245-46. As a result, they asserted the continuing violations doctrine applied because their requests were denied "pursuant to an ongoing discriminatory policy." *Id*. at 1246.

      *Cherosky* confirmed that "the Supreme Court substantially limited the notion of continuing violations" and had rejected application of the continuing violations doctrine to serial violations such as this. Since none of the denials occurred within the 45-day time frame, the employees tried to cast their allegations as a pattern or practice claim. *Id*. The court concluded that such a claim "cannot be based on sporadic discriminatory acts but rather must be based on discriminatory conduct that is widespread throughout a company or that is routine and regular part of the workplace." *Id*. at 1247 (citation and quotation marks omitted). The Ninth Circuit found that the employees did not demonstrate widespread or routine discrimination by the Postal Service regarding respirator requests. *Id*. Instead, they were attacking the individualized decisions to deny their requests for respirators. *Id*. The Ninth Circuit concluded that these "[i]ndividualized decisions are best characterized as discrete acts, rather than as a pattern or

practice of discrimination." *Id.* "[A] discriminatory practice, though it may extend over time and involve a series of related acts, remains divisible into a set of discrete acts, legal action on the basis of which must be brought within the statutory limitations period." *Id.* at 1248.

Based on these findings, the Ninth Circuit concluded that each of the denials of the requests for respirators was a "discrete act of alleged discrimination" and the claims were time barred because the employees did not contact a counselor within 45 days of the denial. *Id.* The postal workers were not completely without recourse because "if a new request result[ed] in a denial, the [limitations] period [would] begin[ ] to run anew." *Id.*

In 2007, the Supreme Court decided another employment discrimination case that further examined *Morgan*: *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), *superseded by statute*. In *Ledbetter*, the Court said: "A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." *Ledbetter*, 550 U.S. at 628. On the other hand, "if an employer engages in a series of acts *each of which is* intentionally discriminatory, then a fresh violation takes place when each act is committed." *Id.* (citation omitted).

In 2008, the Ninth Circuit applied the "discrete act" language of *Morgan* and *Ledbetter* in *Ngo v. Woodford*, a prisoner civil rights case. *Ngo v. Woodford,* 539 F.3d 1108, 1109-10 (9th Cir. 2008). In that case, Ngo got notice on December 22, 2000, after being released from administrative segregation, that he could not participate in special programs. *Id.* at 1009. A few months later, he asked an officer whether he could play on the prison basketball team and whether he could participate in any and all special programs. In response, he was told he could participate in recreational programs, and that a prison official could review any request to participate in other programs. *Id.* Under the prison's regulation, Ngo had 15 working days to

18

appeal an event or decision. *Id*. Ngo did not appeal until six months after the December 22, 2000 hearing decision, and three months after he got a response to the second request. The Ninth Circuit held that the December 22, 2000 determination was the "discrete act" that triggered the 15-day period. *Id*. at 1110.

In 2012, the Ninth Circuit decided *Pouncil v. Tilton*, which arose in the context of an action brought by an inmate under section 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Pouncil requested conjugal visits with his first wife in 2002. *Pouncil*, 704 F.3d at 570. The prison denied his request under a regulation that did not permit conjugal visits. *Id*. He divorced his first wife, and subsequently re-married. In 2008, he submitted another request for conjugal visits which was denied under a new version of the same policy. *Id*. He filed suit on April 29, 2009, alleging that the regulation that precluded conjugal visits violated his rights. The complaint did not specifically mention the requests for conjugal visits or denials in 2002 or 2008, but it did reference the grievance process that related to his 2008 application. *Id*. at 571.

The defendant argued that Pouncil was challenging the same regulation he originally challenged in 2002, and the denial in 2008 was just the inevitable consequence of the original denial. *Id*. at 574. Pouncil argued he was challenging the 2008 denial which was a discrete act that started the clock running anew to file his claims. *Id*.

The court discussed and reconciled the case law in this area up to that point and concluded that courts must determine whether a claim involves a "delayed, but inevitable, consequence" of the original decision, or "an independently wrongful, discrete act" which "beg[ins] the running of the statute of limitations anew[.]" *Id*. at 581.

In *Pouncil*, the court determined that the 2008 denial of the request for conjugal visits was a separate, discrete act, that triggered the statute of limitations to begin anew. *Id*. The court explained that an event is separate and discrete if it does not rely on "acts that occurred before the statute of limitations period to establish a violation of" rights. *Id*. (citations omitted). In *Pouncil*, the 2008 denial established a violation of the inmate's rights without the necessity of the 2002 denial. This is because: "the 2008 denial relied on a new application of the regulation to a new request for a conjugal visit, it did not rely on the 2002 denial as barring all subsequent requests for conjugal visits." *Id*.

The Ninth Circuit pointed out that this was consistent with the conclusions in *Knox, Cherosky,* and *Ngo*. First, in *Knox*, all of the subsequent letters denying mail and visitation rights relied on the initial letter withdrawing those privileges. Second, in *Cherosky*, there was no discrete act that occurred within the limitations period, but the court acknowledged that the employees could bring a claim for a denial of a new request for a respirator, even though prior requests had been denied. In *Pouncil,* in contrast to *Cherosky*, the subsequent request did fall within the limitations period. Third, in *Ngo*, the inmate was outside the 15-day timeframe with respect to the initial December 2000 determination that he could not participate in programs. He was also outside the timeframe with respect to the determination that he could play basketball, which was a partial withdrawal of the prior determination. He was told that future requests would be subject to review, but he did not allege he made any future request that was denied.

In sum, *Pouncil* held that an independently wrongful act "starts a new clock for filing a claim alleging that act." *Pouncil*, 704 F.3d at 583. "[T]he existence of past acts and the claimant's prior knowledge of their occurrence does not bar a claimant from filing claims about related

1  discrete acts, so long as the subsequent acts are independently wrongful and claims alleging

2  those acts are themselves timely filed." *Id*. (citing *Morgan*, 536 U.S. at 113).

3      **6. Application to this Case**

4      Plaintiff concedes that he received notice of his initial STG designation on December 19,

5  2008. It is unclear why he waited until 2011 to file his grievance on this issue, but even assuming

6  equitable tolling somehow applied until the grievance process was completed in December of

7  2011, he was well outside the two-year statute of limitations when he filed this action in

8  February of 2016.

9      The question is whether there was a subsequent discrete act or acts that independently

10 violated Plaintiff's rights that came within the statute of limitations. There are two possibilities:

11 (1) Plaintiff had subsequent classification determinations that denied his request to move from

12 administrative segregation to general population because of his STG status, and (2) he was

13 validated as STG by the IG's Office for a second time on March 2, 2012. The court must first

14 determine whether any of those subsequent events were separate, discrete acts, or whether they

15 were just the delayed but inevitable consequence of the original decision. If any of those events

16 were separate, discrete acts, they must have been filed within the two-year limitations period

17 (subject to equitable tolling for exhaustion) to be actionable.

18     First, the court finds that the subsequent classification decisions rendered before the

19 second STG validation on March 2, 2012, were the delayed, but inevitable consequence of the

20 original STG designation. *Pouncil* instructs the court to look at whether the subsequent acts are

21 stand-alone violations of constitutional rights, which in turn looks at whether those events rely

22 on acts that occurred prior to the statute of limitations period to establish a violation of rights.

23 Each of the subsequent classification decisions rendered prior to the second STG designation

relied on the original STG determination in denying or deferring classification to general population from administrative segregation. In other words, none of them actually evaluated Plaintiff's STG status anew. Instead, they relied on the prior STG designation to conclude that Plaintiff should remain in administrative segregation instead of being moved to general population.

Even if they could be considered separate, discrete acts, Plaintiff was still outside the limitations period in suing for those acts when he filed suit in February of 2016.

Second, the court finds that the March 2, 2012 STG validation is a separate, discrete act which triggered the running of the statute of limitations. One of Plaintiff's exhibits is a NDOC "Inspector General's Office Security Threat Group or Disruptive Group Designation" dated March 2, 2012, which states that Plaintiff was suspected of being affiliated with a security threat group or disruptive group, and that he had ten days to request a STG due process hearing if he disagreed. (ECF No. 179 at 10.) It also advised him that if he wished to denounce his affiliation, he could request the opportunity for a debriefing interview and investigation in writing to the caseworker.

A review of the March 2, 2012 form in this case indicates that the IG's Office evaluated *anew* whether Plaintiff was a member of a STG and validated him as STG. This can fairly be characterized as a separate and discreet act that triggered the running of the statute of limitations because it did not rely on the prior validation, but made a separate determination of Plaintiff's status.

Considering the March 2, 2012 validation as a separate, discrete act, the court must now consider whether Plaintiff timely filed his action based on the March 2, 2012 STG designation,

1 keeping in mind that a cause of action accrues when the plaintiff knows or had reason to know of
2 the injury.

3      The March 2, 2012 form is not signed by any prison official. Nor is it signed by Plaintiff.
4 Plaintiff intimates, and the record supports, that he did not find out about the Inspector General's
5 Office March 2, 2012 STG designation until he was advised of it in a response to a kite he sent to
6 Keith on November 17, 2013. (*See* ECF No. 126 at 76.) Generally, an inmate has six months to
7 file a grievance.[6] The response from Keith is not dated, so it is not clear how long Plaintiff would
8 have had to file a grievance on this issue to calculate the period for equitable tolling for
9 exhaustion. He filed grievance 2006-29-80556 on June 15, 2014. The grievance process was
10 completed with respect to grievance 2006-29-80556 on December 15, 2014, when Deal
11 responded to the second level grievance. Plaintiff filed the lawsuit on February 26, 2016. .
12 Assuming that the grievance was timely initiated (the grievance was not rejected as untimely;
13 therefore, this appears to be a reasonable assumption), Plaintiff filed this action within two years
14 of completion of the grievance process with respect to this claim. Therefore, a lawsuit based on
15 the March 2, 2012 STG designation appears to have been timely.

16      The court's findings on the statute of limitations issue have an impact regarding the
17 defendants against whom Count IV proceeds. Defendants LeGrand and McDaniel are only
18 implicated in connection with the 2011 grievance, which would be outside the statute of
19 limitations. Therefore, summary judgment should be entered in favor of LeGrand and McDaniel.

20      The court will now turn to the merits of the claim.

21

22

23

---

[6] The court takes judicial notice of Administrative Regulation (AR) 740, which governs NDOC's grievance procedure and states that an inmate has six months to grieve an issue.

**B. Merits of the STG Designation Claim**

    **1. Summary of Argument**

    Plaintiff argues that summary judgment should be granted in his favor because he spent from May of 2013 until November of 2016 in administrative segregation because he was classified as a STG member without being given a STG due process hearing. He contends that the defendants were made aware of this through kites and grievances, yet failed to ensure he was given a hearing consistent with NDOC policy (AR 446).

    Defendants argue that Plaintiff received classification reviews 16 times from 2013 to 2015. In addition, they contend that the Inspector General's Office is responsible for validating or de-validating an inmate; therefore, these Defendants cannot be liable for responding to Plaintiff's grievances. Finally, they assert that Plaintiff may not recover damages against the Defendants insofar as they are sued in their official capacities.

    **2. Legal Standard**

    When placement in administrative segregation impairs an inmate's liberty interest, due process must be provided. *See Bruce v. Ylst,* 351 F.3d 1283, 1287 (9th Cir. 2003) (citing *Toussaint v. McCarthy,* 801 F.2d 1080, 1099 (9th Cir. 1986)), *overruled on other grounds by Sandin v. Connor,* 515 U.S. 471 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

    The Due Process Clause itself does not give prisoners a liberty interest in avoiding transfer to more adverse conditions of confinement. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). States may create liberty interests which are protected by the Due Process Clause when the change in conditions of confinement imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. While temporary or short-term confinement in administrative segregation generally does not implicate a

protected liberty interest, the imposition of an indeterminate term in administrative segregation as a result of an STG gang validation constitutes a greater deprivation, and courts have held that such conduct implicates a protected liberty interest. *See Suarez v. Kate,* No. 2:12-cv-2048 KJM EFB, 2014 WL 996018, at * 8 (E.D. Cal. Mar. 13, 2014 (placement in SHU for indefinite term based on gang affiliation implicated protected liberty interest such that defendants were constitutionally required to provide the plaintiff with certain minimal procedural due process protections); *Castro v. Prouty*, No. 1:09-cv01763 GBC PC, 2011 WL 529493, at * 3 (E.D. Cal. Feb. 3, 2011) (citing *Wilkinson*, 545 U.S. at 223-25, and assumed that confinement in the SHU for an indeterminate period implicates a protected liberty interest), *aff'd*, 478 Fed.Appx. 449 (9th Cir. 2012); *Madrid v. Gomez*, 889 F.Supp. 1146, 1271 (N.D. Cal. Jan. 10, 1995) ("defendants may not confine prison gang members in the SHU, nor hold them there on indeterminate terms, without providing them the quantum of procedural due process required by the Constitution").

The Ninth Circuit has held that when an inmate is validated as a gang member, "due process require[s] prison officials to give [the inmate] an opportunity to present his views to the 'critical decisionmaker.'" *Castro v. Terhune*, 712 F.3d 1304, 1308 (9th Cir. 2013) (citing its prior reversal and remand in that case, *Castro v. Terhune*, 29 Fed.Appx. 463, 466 (9th Cir. 2002) (*Castro I*)). In *Castro I,* the Ninth Circuit held that the inmate may not "be entitled to a formal judicial hearing or the full range of due process protections, [but] due process does require some notice of the charges against him and a meaningful opportunity to present his views to the critical decisionmakers." *Castro I,* 29 Fed.Appx. at 466  (citing *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976); *Madrid*, 889 F.Supp. at 1277); *see also Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) (inmate is entitled to "some notice of the charges against him and an opportunity to

present his views to the prison official charged with deciding whether to transfer him to administrative segregation")).

### 3. Analysis

The evidence is undisputed that Plaintiff was designated STG in 2006 or 2007, and then again in 2012, without receiving a STG due process hearing. In fact, he did not receive a STG due process hearing until March 30, 2016, approximately a month after he filed this action.

### a. The Subsequent Classification Reviews Did Not Satisfy Due Process

First, Defendants' argument that Plaintiff has no claim because his classification status was reviewed 16 times between 2013 and 2015 is unavailing. Plaintiff is complaining about the fact that he never received a STG due process hearing in the first place. The classification determinations between 2013 and 2015 relied on the STG designation in keeping him in administrative segregation, and never evaluated whether Plaintiff should have been classified as STG in the first instance.

A post-deprivation review (the classification review decision made after each of the STG designations) is not required to "independently reexamine the basis of the validation decision in order to satisfy due process, *if the prisoner had a previous opportunity to present his views on the correctness of the validation.*" *Castro I*, 29 Fed.Appx. at 465 (emphasis added) (citing *Madrid*, 889 F.Supp. at 1278).

Since Plaintiff did not have a previous opportunity to present his views regarding the STG designation, the subsequent classification review decisions did not serve to satisfy the due process requirements. Instead, Plaintiff's due process rights were violated when he was not given an opportunity to present his views in opposition to the STG designation.

**b. Liability Must be Demonstrated for Each Defendant**

The question that remains is whether each of the Defendants is liable for a violation of Plaintiff's due process rights. A prisoner is entitled to present his view regarding a STG validation to the appropriate decision maker. It is reasonable to conclude then that a prison official who denies an inmate's ability to present his views challenging the STG validation violates the inmate's right to due process.

At the outset, the court rejects Defendants' argument that they cannot be liable because they were only responding to grievances. Grievances are the NDOC's system for alerting prison officials to issues an inmate is experiencing within the prison. The grievance provides notice to prison officials of an asserted problem, and gives the inmate and prison an opportunity to resolve the dispute informally before an inmate resorts to litigation. If a grievance responder is made aware of a constitutional violation but does nothing to rectify the situation, the responder should not be absolved of liability simply because he or she was only responding to a grievance. *See e.g. Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014) (prison official that personally denied a grievance could be found to contribute to constitutional violation).

**i. Keith**

Keith initially responded to Plaintiff's November 17, 2013 kite, advising Plaintiff that the IG's Office had validated him on March 2, 2012. (ECF No. 126 at 76.) Then, on June 15, 2014, Plaintiff submitted grievance 2006-29-80556, stating that he had been labeled STG but had never received a hearing. (*Id.* at 92-93.) Keith responded to the informal level grievance stating that to the extent Plaintiff wanted a due process hearing for his STG affiliation, he needed to kite his caseworker and he would be added to the hearing list. (*Id.* at 91.)

Keith did not deny Plaintiff a hearing, but instructed him (consistent with AR 446) on how to obtain a hearing. Therefore, Plaintiff's motion for summary judgment should be denied as to Keith, and Keith's motion for summary judgment should be granted.

### ii. Baca

Baca responded to the first level of grievance 2006-29-80566. He stated that Plaintiff was now housed at WSCC, and instructed Plaintiff to consult his caseworker to address his issues. (*Id*. at 89.) Similar to Keith, this action did not violate Plaintiff's his due process right to a hearing.

Baca also responded at the first level in grievance 2006-29-98644, where Plaintiff again complained he had been designated STG without a hearing. In response to that grievance, Baca stated that Plaintiff was outside the timeframe to contest the 2007 validation.

At this point, Baca had already been informed that Plaintiff was designated STG and was in administrative segregation without having had a STG due process hearing. Baca previously told Plaintiff to kite his caseworker to address the issue. In response to the subsequent grievance, he contradicts the prior response by telling Plaintiff he was outside the timeframe. In doing so, he denied Plaintiff access to a hearing. Therefore, Plaintiff's motion for summary judgment should be granted as to Baca, and Baca's motion for summary judgment should be denied.

### iii. Deal

Deal responded to the first level of grievance 2006-29-80566, acknowledging that Plaintiff was housed in administrative segregation at NNCC due to his STG validation. Deal also acknowledged Plaintiff's statement that he had been asking for a due process hearing for six years, but said that Plaintiff should have requested a hearing within 10 days of being notified of his validation. To the extent Plaintiff claimed he was never notified of the validation, Deal told

1  him to submit a written request for a hearing and he was sure NNCC staff would be willing to

2  schedule one. (*Id*. at 85.)

3       Deal did not deny Plaintiff a hearing, but instructed him to submit a written request for a

4  hearing, consistent with AR 446. Therefore, Deal did not violate Plaintiff's due process rights.

5  Deal's motion for summary judgment should be granted, and Plaintiff's motion for summary

6  judgment should be denied as to Deal.

7                       **iv. Irvin**

8       Plaintiff filed grievance 2006-29-98664 on April 14, 2015, stating he had been denied a

9  STG hearing after being designated a white supremacist. (*Id*. at 62-68.) Irvin responded to the

10  informal level grievance stating that Plaintiff had been validated as a white supremacist in 2007

11  and was outside the time frame to appeal the validation. (*Id*. at 66.)

12       Unlike his previous grievance documentation, Plaintiff specifically informed Irvin in the

13  informal grievance that on April 7, 2015, he asked his caseworker (Rexwinkle) to put him in for

14  a hearing and she told him to file a grievance. Irvin's response ignored the fact that Plaintiff

15  asked for a hearing and had never been given one. Therefore, Irvin violated Plaintiff's due

16  process rights by denying him access to a hearing. Plaintiff's motion for summary judgment

17  should be granted, and Irvin's motion for summary judgment should be denied.

18                       **v. Foster**

19       In his second level grievance for 2006-29-98664, Plaintiff indicated he had never been

20  informed of his designation and could not have requested a hearing. Foster responded to the

21  second level grievance and directed Baca to have Plaintiff scheduled for a classification

22  committee hearing to discuss his STG status. (*Id*. at 62.)

23

Foster upheld Plaintiff's grievance, and directed Baca to have a hearing. Plaintiff does not present evidence that he subsequently advised Foster that Baca did not follow through on her direction and she failed to act. Therefore, Foster did not deny Plaintiff his due process rights. Foster's motion for summary judgment should be granted, and Plaintiff's motion for summary judgment should be denied as to Foster.

### vi. Walsh

Plaintiff sent a kite on May 7, 2015, asking to go to general population, and Walsh responded Plaintiff could not because of gang affiliation and only the warden could approve him for general population. (*Id*. at 73.) He sent another kite to Walsh on May 11, 2015, and said he was not a gang member and had never had a STG hearing. He stated that if that was the issue, he was requesting a hearing under AR 446. Walsh responded that there was a new warden and things had changed. (*Id*. at 74.) She did not address Plaintiff's request for a hearing by referring his request to his caseworker or the IG's Office. Therefore, Walsh violated Plaintiff's due process rights. Plaintiff's motion for summary judgment should be granted as to Walsh, and Walsh's motion for summary judgment should be denied.

### vii. Skulstad

Plaintiff filed grievance 2006-30-15344 on January 10, 2016, stating he had been classified STG without a hearing. Skulstad responded to the informal level grievance (dated February 4, 2016), and confirmed he had been listed as a white supremacist for the first time in 2006, and was re-validated in 2012. She confirmed he had not been provided a STG due process hearing, and instructed him to request a hearing through the Institutional Investigator, and upheld the grievance.

Given that Skulstad upheld Plaintiff's request, and he was provided with a due process hearing the following month, Skulstad did not deny Plaintiff his due process rights. Skulstad's

1  motion for summary judgment should be granted, and Plaintiff's motion should be denied as to

2  Skulstad.

3        **4. Conclusion Re: Due Process Violation**

4        The evidence demonstrates that the following defendants ignored or denied Plaintiff's

5  request for a STG due process hearing, violating his right to due process: Baca, Irvin, and Walsh.

6  Therefore, Plaintiff's motion for summary judgment should be granted as to those defendants,

7  and denied as to Keith, Deal, Foster and Skulstad.

8        Defendants' motion for summary judgment on the merits of Count IV should be denied as

9  to Baca, Irvin and Walsh, but granted as to Keith, Deal, Foster and Skulstad.

10  **C. Damages**

11       Defendants are correct that Plaintiff cannot recover monetary damages from Defendants

12  insofar as they are sued in their official capacities. *See Snow v. McDaniel*, 681 F.3d 978, 991 (9th

13  Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003)

14  ("[F]ederal courts are barred by the Eleventh Amendment from awarding damages against state

15  officials acting in their official capacities[.]"). A plaintiff may proceed against defendants in their

16  official capacity insofar as he seeks injunctive relief. Therefore, Defendants' motion for summary

17  judgment should be granted insofar as Plaintiff seeks to recover damages against the remaining

18  defendants in their official capacities.

19       Plaintiff moved for summary judgment as to liability, but made no argument as to

20  damages or other relief requested. Therefore, this case should proceed to determine what relief

21  Plaintiff is entitled to as to Count IV regarding the violation of Plaintiff's right to due process by

22  Baca, Irvin and Walsh.

23

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **GRANTING IN PART AND DENYING IN PART** Defendants' counter-motion to dismiss (ECF No. 158) (which the court converted to a motion for summary judgment) and motion for summary judgment (ECF No. 181) insofar as it addresses the statute of limitations and Count IV. Plaintiff's claims, to the extent premised on the initial STG designation and subsequent classification decisions before the second STG designation on March 2, 2012, are time barred. As a result, summary judgment should be granted in Count IV as to defendants LeGrand and McDaniel because Plaintiff's claim against them is centered on conduct that occurred in 2011, which is time-barred.

(2) **GRANTING** Plaintiff's motion for summary judgment (ECF No. 126) as to defendants Baca, Irvin and Walsh in Count IV, and **DENYING** it as to Keith, Deal, Foster and Skulstad.

(3) **GRANTING** Defendants' motion for summary judgment on the merits of claim IV (ECF No. 181) as to defendants Keith, Deal, Foster and Skulstad, but **DENYING** it as to Baca, Irvin and Walsh.

(4) **GRANTING** Defendants' motion for summary judgment insofar as Plaintiff may not recover monetary damages against Defendants sued in their official capacities.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's

Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.


Dated: May 14, 2019

William G. Cobb
United States Magistrate Judge

33