# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RONALD COLLINS,

     Plaintiff,

v.

JOSHUA COLLINS, *et al.*,

     Defendants.

Case No.: 3:16-cv-00111-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 181

     This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Defendants' Partial Motion for Summary Judgment. (ECF Nos. 181, 181-1 to 181-9, 183-1 to 183-4.)[1] Plaintiff filed a response. (ECF No. 193.) Plaintiff also filed supplements. (ECF Nos. 195, 197.) Defendants moved to strike these supplements, but the court issued a separate order denying those motions. (ECF No. 234.) Defendants filed a reply. (ECF No. 214.)

     After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

*///*

*///*

*///*

---

[1] This Report and Recommendation addresses the motion only with respect to certain claims in Counts I and III. The motion was addressed as to Count IV in a separate report and recommendation because overlapping arguments were made concerning Count IV in Plaintiff's partial motion for summary judgment (ECF No. 126), and Defendants' counter-motion to dismiss (ECF No. 158).

# I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 20.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC), Lovelock Correctional Center (LCC), and Warm Springs Correctional Center (WSCC). (*Id.*) Defendants are Dr. Romeo Aranas, Isidro Baca, Joshua Collins[2], Dwayne Deal, Sheryl Foster, Dr. Karen Gedney, Joel Hightower, Silvia Irvin, Dillyn Keith, Robert LeGrand, Dr. David Mar, E.K. McDaniel, Holly Skulstad, and Lisa Walsh. Julie Rexwinkle has been dismissed without prejudice. (ECF No. 232.)[3]

This motion only concerns certain of the claims proceeding in both Counts I and III. Plaintiff was allowed to proceed with the following claims in Counts I and III:

**Count I:** (a) an Eighth Amendment claim for deliberate indifference to serious medical needs against defendant Collins based on allegations that Collins withheld Plaintiff's lunches for a week at a time; (b) a retaliation claim against defendant Collins based on allegations that Collins injured Plaintiff's arm and filed false charges against him when Plaintiff asked for a grievance; and (c) an excessive force claim against defendant Collins.

**Count III:** (a) an Eighth Amendment deliberate indifference claim related to a growth on Plaintiff's hand against Dr. Gedney, Dr. Mar, and Dr. Aranas; (b) an Eighth Amendment deliberate indifference claim related to treatment of Plaintiff's back which resulted in nerve damage and a "drop foot" against defendants Dr. Gedney, Dr. Mar and Dr. Aranas. (ECF Nos. 8, 19.)

---

[2] Plaintiff is Ronald Collins, and sues defendant Joshua Collins, who is implicated in Count I. To avoid any confusion, the court will refer to Plaintiff as such, and defendant Collins as Collins.

[3] The court has recommended in ECF No. 235 that summary judgment be granted as to defendants Deal, Foster, Keith, LeGrand, McDaniel and Skulstad.

Defendants only move for summary judgment as to the retaliation and excessive force claims against Collins in Count I, and the Eighth Amendment claim against Dr. Gedney, Dr. Mar and Dr. Aranas concerning Plaintiff's hand in Count III. They did not move for summary judgment as to the Eighth Amendment claim against Collins in Count I alleging that Collins denied him lunches for a week, or as to the deliberate indifference claim in Count III related to treatment of his back. Nor did they move for summary judgment as to the excessive force claim against Hightower in Count II.

First, Defendants argue that Plaintiff's claims of excessive force by Collins in Count I are disproven in the video of the incident. Second, Defendants assert that Collins did not retaliate against Plaintiff as alleged in Count I. Third, with respect to Count III, Defendants contend that insofar as Dr. Gedney and Dr. Mar are concerned: Plaintiff fails to prove he suffered from a serious medical need as to his hand; they were not deliberately indifferent; and, a difference of opinion cannot give rise to liability under the Eighth Amendment. With respect to Dr. Aranas, it is argued that his only involvement was responding to Plaintiff's second level grievance, and he did not violate Plaintiff's Eighth Amendment rights. Finally, Defendants argue that Plaintiff may not recover monetary damages against Defendants sued in their official capacities.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-50. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. Exhibit A**

Plaintiff moved to strike Defendants' Exhibit A filed in support of their motion which they represent is a video of the interaction between Plaintiff and Defendant Collins pertaining to Count I. (ECF No. 203.) The court held a hearing on the motion on January 4, 2019.

The court granted the motion to strike in part and denied it in part. Plaintiff argued that the video was missing footage. Deputy Attorney General Zana explained that the original video clip

could not be downloaded, and as directed by the court, the Defendants took a video of the computer playing the video and provided a copy to the court. She represented that the warden's secretary made the copy of the video from the computer playing the original video footage. The court ordered Deputy Attorney General Zana to submit a revised copy of the video footage to include the time before 12:22 p.m. and after 12:42 p.m., which was the timeframe of the incident described by defendant Collins in his incident report. It was to be titled Supplemental Exhibit A-1 to the partial motion for summary judgment. The court also directed Deputy Attorney General Zana to submit a declaration from the Warden's Secretary explaining the steps undertaken to copy the video from the computer playing the original video footage and whether the copy depicts the same events captured on the original video footage. The court also ordered the warden or associate warden to review the original video footage and video copied and submit a declaration regarding what is being captured and whether there is missing video footage from the recently made video. (ECF No. 224.)

Defendants submitted a document on January 17, 2019, stating that the entirety of the video was previously provided. (ECF No. 227 at 2.) The document clarified that it was Warden Baca who had copied the video from the original video, and included a declaration from Warden Baca that the copy did not edit or modify the original in any fashion. (ECF No. 227-4.) Warden Baca states that the surveillance video of Plaintiff being removed from his cell initially and being placed in the shower was not preserved. Due to computer software issues and the surveillance video being from their old video system, they could not make a copy from the computer, so he set up a video camera and recorded the monitor. Associate Warden Brian Ward also submitted a declaration stating that the original video was not edited or altered in any fashion when it was copied. (ECF No. 227-5.)

Plaintiff has filed an objection concerning the court's ruling on the motion to strike Exhibit A that remains outstanding as of the time this Report and Recommendation was issued. (ECF No. 228.) He objects to the undersigned not ordering all of the video produced, or striking it if the entirety is not produced. Defendants filed a response maintaining that the entirety of the video had been produced. (ECF No. 229.) Plaintiff filed a reply. (ECF No. 230.)

As the objection has not yet been ruled on, the court has considered Exhibit A in its analysis, and will discuss the implications of the exhibit below.

**B. Count I**

Plaintiff was permitted to proceed with a retaliation claim in Count I based on allegations that Collins injured him and filed false charges against him in retaliation for filing grievances. Plaintiff was also allowed to proceed with an excessive force claim against Collins based on the allegations that Collins tore his bicep and jerked his arm with extreme force multiple times after Plaintiff told him that he was causing Plaintiff pain.

Plaintiff alleges that on March 1, 2015, he was placed in the unit shower cage while Collins went and searched his cell. (ECF No. 20 at 11.) He contends he suffered in pain when he was forced by Collins to stand in the shower to the point he could hardly walk back to his cell after it was searched. (*Id.*) Then, Collins placed Plaintiff back in his cell, and he had to face the back of the cell so Collins could unlock the lock at the end of the chain that was wrapped around Plaintiff's waist. (*Id.*) This was done through the food slot door while the cell door was closed. (*Id.*) Plaintiff claims it was apparent after five minutes that Collins was purposefully pulling Plaintiff to the door by the chain and playing around with the lock, causing Plaintiff a great deal of pain. (*Id.*) Plaintiff cried out that Collins was hurting him. (*Id.* at 12.) In response, Collins placed his foot on the cell door and pulled with all his force, pulling Plaintiff's arm up through the food slot along with part

of the chain, which tore Plaintiff's biceps muscle in the upper arm and something in his shoulder. (*Id.*) He alleges that he was jerked five times before his arm came up through the food slot. (*Id.*) Plaintiff continued to cry out in pain. (*Id.*) Officer Holtz told Collins to stop, and he eventually released the chain. (*Id.*) He claims that he was eventually seen by a surgeon for his arm and shoulder and was told that the bicep was torn beyond repair, and would only do an MRI of the shoulder if they planned to do surgery. (*Id.* at 14.)

Plaintiff goes on to allege that on March 2, 2015, while Collins was serving Plaintiff his medical lunch, he looked at Plaintiff and said, "You'll get nowhere with your complaints - I hope you learned that yesterday." (*Id.* at 14.) Plaintiff asserts that because Plaintiff filed an emergency grievance, Collins retaliated against him by filing false disciplinary charges against Plaintiff regarding the incident the day before. (*Id.*) Plaintiff was ultimately found not guilty of the charges. (*Id.* at 15.)

### 1. Excessive Force

#### a. Legal Standard

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. It "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). The "unnecessary and wanton infliction of pain...constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

"[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v.*

1    *McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v. McKinney*, 394

2    F.3d 710, 711 (9th Cir. 2005); *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). "When

3    prison officials maliciously and sadistically use force to cause harm, contemporary standards of

4    decency are always violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327).

5        In determining whether the use of force is excessive, courts are instructed to examine "the

6    extent of the injury suffered by an inmate[;]" "the need for application of force, the relationship

7    between that need and the amount of force used, the threat 'reasonably perceived by the responsible

8    officials,' and 'any efforts made to temper the severity of the forceful response.'" *Hudson*, 503

9    U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

10        **b. Analysis**

11        First, Plaintiff contends that due to the length of time he was forced to stand in the shower

12    cage, he could hardly walk back to his cell and was in pain. Collins takes the position that the video

13    shows Plaintiff sitting or sitting on his feet/kneeling on the floor, and he could have stood up, sat

14    down, laid down, or walked around the area.

15        As was discussed above, the video does not show the entirety of the period when Plaintiff

16    was in the shower cage, but only the forty seconds before the officers arrived to escort him to his

17    cell. During those forty seconds, Plaintiff is shown crouched down. When he gets up, he appears

18    to have some difficulty with movement and had a limp. When he is escorted out of the caged area

19    to his cell, he also appeared to walk with a slight limp.

20        Since it is not clear how long Plaintiff was in the shower cage, or what occurred prior to

21    the time the video footage starts, the court finds there is a genuine dispute of material fact as to

22    whether Plaintiff's rights were violated at that point. It should be noted that a declaration of inmate

23

Gwyn submitted by Plaintiff states that Plaintiff was in the shower cage for approximately 30 minutes. (*See* ECF No. 159 at 30.)

Second, the court will address the alleged excessive force that occurred when Plaintiff was brought back to his cell and Collins attempted to take off the belly chain lock through the food slot.

According to Collins, Plaintiff was failing to comply with his instructions and was struggling and pulling away from him. Collins maintains that he did not pull the chain and put his foot on the door so that Plaintiff's arm was pulled through the food slot. Collins does not submit a declaration, but relies on his statement in the investigation detail report following the event, as well as the video footage of the incident.

The investigation detail report stated that Plaintiff became agitated and refused orders to have his waist restraints removed. According to Collins' own report within the investigation detail report, while Collins was trying to remove the waist restraint lock, Plaintiff became agitated and abruptly stood up, and complained that his back hurt.  Collins told Plaintiff to tell him next time and he would allow Plaintiff to stand up and they could start over. Plaintiff responded: "I'm not going to fucking wait for you to tell me."

When Collins went back to try and remove the lock again, Collins claimed that Plaintiff spun aggressively to the left and began tugging on the chain while Collins still had it in his hand. Collins said that he initially hung onto the chain in his right hand so Plaintiff could not capture it, and then subsequently let Plaintiff capture it and closed the food slot. Collins asked Plaintiff what that was about, and he said: "They were fucking tangled up!" Collins report acknowledges that Plaintiff then requested a "man-down," because he felt the restraint chain was pulled into the food slot injuring his wrist. Then medical staff arrived and a medical assessment was completed noting

10

negative results of any injury to the wrist. (ECF No. 181-1 at 2-3; ECF No. 195 at 37.) The video will be discussed below.

Plaintiff on the other hand, says that Collins was playing around with the lock on the belly chain restraints, keeping Plaintiff in a bent down position, and when Plaintiff cried out in pain Collins began jerking the chain, and placed his foot on the door and jerked the chain until his arm went through the food slot, injuring his bicep/shoulder. (ECF No. 195 at 8-9 ¶ 11-13.) Plaintiff claims that after he gained control of the chain, he pushed his emergency call button in his cell, and Sergeant Roberson arrived. He told Sergeant Roberson what happened, and that his arm and shoulder were in pain. He was not taken to an infirmary, but a nurse was called. (*Id.* ¶ 14.)

Plaintiff filed a grievance that same day, stating that Collins used excessive force causing injury to his arm. The grievance stated that he was taken back to his cell after Collins searched it, and was in belly restraints. He could only bend down for a short time for the officer to unlock the lock behind his back due to his medical condition. Plaintiff told Collins he was in pain, and Collins jerked the chain. Collins subsequently got the lock undone, and grabbed the chain and kept pulling toward the door, and put his foot against the door and jerked the chain, injuring Plaintiff's muscle in his shoulder. In his first level grievance, he indicated that medical had given him a sling for his arm. (ECF No. 195 at 69-79.)

Plaintiff filed an emergency grievance the following day, stating that Collins had assaulted him, and that his arm and shoulder muscles were ripped and causing pain. (ECF No. 195 at 47.)

A medical report dated March 2, 2015, states that Plaintiff reported he tore a muscle in his left shoulder. The nurse indicated there was an exaggerated display of discomfort, but x-rays were ordered and he was instructed to follow up with a doctor. (ECF No. 195 at 33.)

Plaintiff filed another grievance on March 3, 2015, stating that he had not seen a doctor after the incident and he asked for an investigation. (ECF No. 195 at 45-46.)

Plaintiff also submits the declaration of inmate Gwyn (dated March 27, 2015), whose cell was across from Plaintiff's. Gwyn corroborates Plaintiff's statement that while Collins was trying to unchain him, Plaintiff yelled out, and Collins put his foot on the cell door and yanked on the chain. Gwyn subsequently saw Plaintiff's arm which was bruised and black and blue. (ECF No. 195 at 29-31.)

Plaintiff called a "man-down" on March 30, 2015, because he was still in pain. (ECF No. 195 at 11 ¶ 22.) The medical report from that day indicates that Plaintiff complained that his shoulder was "killing" him, and his bicep was torn. The nurse observed that the right bicep was visually sagging. He was given ibuprofen and analgesic balm and was referred to Dr. Walls for possible bicep repair. (ECF No. 195 at 34, 93.)

Collins filed a statement to initiate disciplinary charges following the incident. (ECF No. 195 at 50.) Plaintiff was charged with disobedience and abusive language. (*Id.*) Plaintiff told the disciplinary hearing officer that excessive force in attempting to remove the restraints causing Plaintiff to injure his arm and seek medical treatment. (ECF No. 195 at 51.) At the disciplinary hearing, Collins said that he was compliant with the restraints until he could not stand any longer, and when he told this to the officer, the officer pulled on the restraints to keep him standing, and his arm was torn. (ECF No. 195 at 53.) He was found not guilty. (*Id.* at 55.)

After being found not guilty of the charges, Plaintiff filed another grievance, again reiterating that Collins injured his arm.

Plaintiff saw Dr. Walls on April 6, 2015. He reported to Dr. Walls that six weeks prior his right shoulder was injured when it was pulled into a door by his chains. He had constant pain. On

examination, he was tender to superficial palpation in the area, and the right proximal bicep retracted distally. An x-ray was performed, and no fracture or dislocation was seen. He was assessed with probable right proximal bicep tear, and diffuse right upper quadrant and arm pain of unclear etiology. Dr. Walls recommended a right-shoulder MRI to assure there was not a rotator cuff tear, and Plaintiff was to return to the clinic after the MRI was completed (if performed). (ECF No. 195 at 99-100.) A review of the medical records does not indicate that an MRI was performed.

Plaintiff sent a kite on March 12, 2016, asking if he was scheduled to see Dr. Long regarding his arm and shoulder injury. (ECF No. 197 at 227. )

A medical report from Dr. Richard Long from April 6, 2016, states that Plaintiff reported a right shoulder biceps injury in March of 2015, where a chain was yanked backward and his right shoulder was hyperextended. He noted immediate pain, followed by swelling and ecchymosis, over the anterior right shoulder, and as that went down he had cramping and obvious "Popeye deformity." On physical examination, Dr. Long observed that Plaintiff had classic Popeye deformity, which was "surprisingly tender." His motion and strength were reasonable, but he still had cramping. The impression was: "rupture of the long head of the biceps in March 2015. It has now been over one year. This is a nonoperative lesion at this amount of time." It was recommended that he see Dr. Vacca for his back trouble, and stated that the right shoulder would not give him any problem with anything that was pending. (ECF No. 195 at 97.)

On June 6, 2016, Plaintiff sent a kite that his arm was still hurting badly. (ECF No. 197 at 228.)

The court finds a genuine dispute of material fact exists as to the alleged excessive force that occurred while Collins was trying to take the lock off of the belly chains through the food slot. The parties clearly have differing version of events from March 1, 2015.

13

According to Collins, Plaintiff was agitated and not following orders, but Collins did not jerk the chain causing Plaintiff's arm to come through the food slot. His claim is substantiated by his own report. Plaintiff disagrees, and maintains that he told Collins he was in pain, and Collins proceeded to jerk the chain with such force that it injured his arm. Plaintiff's claim is substantiated by his kites and grievances, reports to physicians, and the declaration of inmate Gwyn.

Contrary to Collins' assertion, the video does not blatantly contradict Plaintiff's version of events. Instead, because of the vantage point of the video and the fact that there is no audio, it is not possible to confirm either party's story.

The video shows Plaintiff being escorted by Collins (identified as the officer in the hat) and another officer (presumably Officer Holtz as identified in the investigative detail reports and by Plaintiff) to his cell. They put him in the cell and close the door. The food slot is open, and Collins can be seen bending down to the food slot. At that point, Collins can be seen with his hands doing something through the food slot for just over ten seconds. Plaintiff appears to be crouched down as well on his side of the door, with his back to the door. Plaintiff can then be seen moving away from the door, and as he does so, Collins gets up from his crouched position and closes the food slot and looks in the cell door window. Plaintiff can subsequently be seen looking through the window at the officers. A conversation appears to occur between the officers and Plaintiff, who can be seen standing and facing the officers through the window, but there is no audio.

The food slot is opened again, and Plaintiff appears to crouch back down with his back towards the door. Collins bends back down and his hands are in the food slot for approximately 13 seconds. Plaintiff moves away from the door, and Collins almost simultaneously moves away from the door and the food slot is closed again.

It appears they have another conversation, but there is no audio to discern what is being said. The video camera is then zoomed out much further. (No one ever identifies who was operating the camera, or why it zooms out at that point.) They continue talking. The food slot is opened again, and Collins bends down again and his hands are in the food slot for approximately seven or eight seconds. At that point, the court cannot see the position of Collins' left foot, but Collins does appear to suddenly pull back. It is not clear whether he was pulling the chain back at that point, but Collins' statement admits that he did initially keep hold of the chain when he thought Plaintiff was trying to capture it, but subsequently let it go. The camera is zoomed out enough that the court also cannot see visualize what is happening inside the food slot in terms of any motion by Plaintiff.

Another conversation occurs among the officers and Plaintiff, though it is not clear what is said. The food slot is closed again. Collins then walks out of view, and Officer Holtz stays near the door. Collins returns to the cell door once more, and then walks away from the cell again. When he returns, he stands by the cell door with Officer Holtz. Then, both officers leave the cell door and walk away.

The camera subsequently zooms in on Plaintiff's cell door and food slot. Plaintiff comes in and out of view in the cell door window. Collins and Holtz return. Officer Holtz opens the food slot and looks inside the cell window and appears to speak with Plaintiff. Officer Holtz then kneels down to the food slot, while Collins stands to the side of the door. Officer Holtz's arms are then in the food slot, and it appears that a chain is taken out through the food slot. Officer Holtz reaches in the food slot again, and stands up with the chain. Both officers then raise their hand, and the cell door is opened. Plaintiff can be seen kneeling down with his back facing the door. He gets up and is holding his shoulder/armpit area as he is escorted out of the cell into the common area of the

tier. Then another two officers walk up to them, one of whom is presumably Sergeant Roberson, as both parties identified him as responding after the incident.

The camera then pans out and medical personnel have arrived as well. Plaintiff can be seen pointing to his shoulder/armpit area. Medical personnel then examine Plaintiff. It appears medical personnel were examining his wrist. Then the video stops.

While Collins might not have been playing around with the lock for five minutes straight as Plaintiff alleges, he was engaged in doing something through the food slot—presumably, trying to get the lock off of the belly chain restraints, two times before the third attempt where Collins can be seen pulling back somewhat abruptly. It is not clear the chain was in his hand, but Collins seemed to admit as much in his reports. It also cannot be seen whether Plaintiff's arm was pulled through the food slot.

In sum, whether Collins tried to take the chain back because Plaintiff was not following orders and he feared for his safety, as Collins suggests, or he jerked the chain back and pulled Plaintiff's arm through the food slot after Plaintiff had been crying out in pain is a material factual dispute that must be determined by the fact finder.

Therefore, Collins' motion for summary judgment should be denied as to the excessive force claim against him in Count I.

///

///

///

///

///

///

## 2. Retaliation

### a. Legal Standard

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of five elements:

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action; (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Jones*, 791 F.3d at 1035 (internal quotation marks omitted) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)). "The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

///

///

///

///

///

///

///

///

///

///

### b. Analysis

Collins argues that Plaintiff was removed from his cell so it could be searched because it was suspected that he had pruno (prison made alcohol) in his cell. In addition, Collins asserts that when Plaintiff was escorted back to his cell, he did not comply with Collins' instructions which caused any injury he suffered. Therefore, Collins maintains there was no retaliation.

Plaintiff alleges that Collins retaliated against him for filing grievances in injuring Plaintiff and filing false disciplinary charges. Collins does not specifically discuss Plaintiff's grievances against him: first, for smashing his medical diet; and second, after the incident where he allegedly injured his arm on March 1, 2015. Plaintiff's declaration states that he asked Collins for a grievance to report the smashing of the medical diet, and Collins responded that he did not pass out grievances. Therefore, Collins knew that Plaintiff was going to file a grievance about smashing his medical diet, and it was after this that the incident occurred at the food slot. (ECF No. 195 at 7 ¶ ¶ 7, 9.)

Nor does Collins address the statement in Plaintiff's verified amended complaint that while serving Plaintiff's medical lunch the very next day, Collins said to Plaintiff: "You'll get nowhere with your complaints—I hope you learned that yesterday."

There is a factual dispute concerning what occurred during the March 1, 2015 incident, and given the proximity in time to this alleged statement, a fact finder could conclude Collins' actions were retaliatory. In addition, Collins relies on the fact that Plaintiff was taken out of his cell because he was suspected of possessing pruno, but Plaintiff was never charged for having pruno in his cell. He was charged for disobedience and abusive language, and was found not guilty.

The court finds that disputed facts preclude the entry of summary judgment in Collins' favor. Therefore, Collins' motion for summary judgment should not be granted as to the retaliation claim in Count I.

**C. Count III-Eighth Amendment Deliberate Indifference Re: Plaintiff's Hand**

     **1. Eighth Amendment Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under

section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard,* 744 F.3d 1076 (9th Cir. 2014) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

### 2. Facts

On January 22, 2015, Plaintiff called a "man-down" and complained of pain and burning in his left hand between the first and second digit, as well as numbness. (ECF No. 197 at 207.) On examination, there was no redness or swelling, but he reported pain when touched. He was assessed with a possible broken vessel or pulled muscle or tendon. The plan was to follow up with a medical provider. (*Id.*)

Plaintiff submitted a kite on January 23, 2015, asking to be seen for the bump on his hand, which was hurting. (ECF No. 197 at 224, 219.) He sent another kite asking to be seen for pain

1  from the bump on his hand on January 30, 2015. (*Id*. at 223.) On January 30, 2015, he saw Dr.

2  Mar. (ECF No. 183-2 at 13-14.) The notes are nearly impossible to read. (*Id.*) They appear to state

3  that Plaintiff had pain in his hand and complained of swelling, and that he was assessed with neck

4  pain as well cyst in the left hand. (Id. at 14.) That date, he was ordered to see Dr. Vacca regarding

5  the cervical vertebrae, and an x-ray of the cervical spine was ordered; labs were ordered with a

6  separate arthritis panel; Plaintiff was ordered to be given a plastic bag for showering; he was also

7  ordered analgesic ointment. (ECF No. 183-3 at 11; ECF No. 197 at 208.)

8       Plaintiff sent a kite on February 12, 2015, stating that his hand still hurt from the bump on

9  his finger, and asked if anything would be done because it was sending shocks down his arm. (ECF

10 No. 197 at 225.) Plaintiff saw Dr. Mar on February 13, 2015. (ECF No. 183-2 at 13.) Again, the

11 notes are almost indecipherable. They appear to state that Plaintiff had pain in the right arm and

12 also mentions the third proximal phalange, and that no x-ray had been done yet. The diagnoses

13 included a cyst in the left hand. (*Id*.) The orders for that date including a direction to find when the

14 appointment with Dr. Vacca was scheduled, and to see the order from January 30, 2015 for the

15 cervical spine x-ray. In addition, an x-ray of the left hand was ordered. (ECF No. 183-3 at 10.)

16      There is a March 2, 2015, order for an x-ray with three views of the left hand as was

17 previously ordered, as well as the left shoulder and cervical spine, and he was to be scheduled with

18 the provider to follow up on the x-rays. (*Id.*)

19      On March 8, 2015, Plaintiff sent a kite asking whether medical would see him for his hand.

20 He noted that x-rays had been taken, but his hand was hurting badly and the bump was growing

21 on his bone and he could hardly use his hand. (ECF No. 197 at 220.)

22      Plaintiff was seen on March 13, 2015. (ECF No. 183-2 at 12.) The records are again

23 difficult to read, but it appears Plaintiff complained of pain standing up. It was noted he would see

Dr. Vacca in three weeks. He was observed as having neck pain and decreased range of motion. The remaining observations are illegible. He appears to have been assessed with general muscle pain and weakness, and for the plan the doctor refers to the orders. The orders reflect labs were ordered; to find Dr. Vacca and present to the doctor; a sling for the right arm; and an MRI of the cervical spine to rule out stenosis. (ECF No. 183-3 at 9.)

On March 18, 2015, Plaintiff sent a kite stating that the bump was still sending shocks down his hand and half of his arm. He said he had seen Dr. Mar twice, but nothing had been done. (ECF No. 127 at 222.) It does not appear he was seen after sending this kite.

On March 30, 2015, he was prescribed an ibuprofen pain pack and analgesic balm and was referred to Dr. Walls regarding a bicep tear. (ECF No. 183-3 at 8.)

He sent another kite on May 5, 2015, asking if anything was going to be done about the bump on his hand that was sending shooting pain down his arm, including when handcuffs were applied. The response indicated Plaintiff was scheduled to be seen. (ECF No. 197 at 221.)

He also filed a grievance on May 5, 2015, stating that he had been telling medical for five months about a hard growth in between his fingers on his left hand which caused a lot of pain. He indicated that when he tried to pick up anything it would send shock waves down his hand and up his arm, including when handcuffs were applied. He had seen Dr. Mar and Dr. Gedney, and they stated they did not know what the bump was, and refused to send him to a specialist. (ECF No. 197 at 209-210.) The informal level grievance was assigned to C. Lucas, who stated that Plaintiff was seen on May 7, 2015, and an x-ray of his hand was viewed, and he was told by the physician that the x-ray was normal and did not require any treatment. (ECF No. 197 at 212.)

Plaintiff saw Dr. Gedney on May 7, 2015. (ECF No. 183-2 at 10-11.) He complained of a bump between the base of his second and third fingers. She noted the bump he referred to was at

22

the base of the proximate phalange. She talked to him about his pain issues. He was on Neurontin and Baclofen. Her notes state that he was not a surgical candidate, but do not indicate what type of surgical candidate (i.e., arm, hand, cervical spine, etc.). Dr. Gedney's notes from May 13, 2015, state that he had a normal EMG, and the neurosurgeon saw no need for further studies, and his back was stable. (*Id.*)

In his first level grievance dated June 25, 2015, he said that medical was refusing to address the pain caused by the bump. (ECF No. 197 at 213.) J. Perry responded to the first level grievance and advised him that he saw Dr. Mar on January 30, 2015, February 13, 2015, and March 13, 2015; Dr. Gedney on May 7, 2015 and July 21, 2015; and Dr. Johns on August 11, 2015; and, an orthopedic specialist on April 6, 2015. His hand was also x-rayed. For pain he was prescribed Indocin, Baclofen, Tylenol, Neurontin, ibuprofen and analgesic balm. He was advised that his physicians determined surgery was not medically indicated at that time. (ECF No. 197 at 214.)

Plaintiff saw Dr. Gedney on July 21, 2015, for complaints of severe osteoarthrosis related to his foot. (ECF No. 183-2 at 7.)

In his second level grievance dated September 25, 2015, he reiterated that medical refused to address the pain caused by the bump in his hand. (ECF No. 197 at 215.) Dr. Aranas responded at the second level that Plaintiff had been evaluated many times by medical providers and an orthopedic specialist, who had not indicated surgery was necessary. He was instructed to kite for re-evaluation if he was still experiencing pain. (ECF No. 197 at 216.)

**3. Dr. Mar and Dr. Gedney**

Dr. Mar and Dr. Gedney argue that Plaintiff does not prove he suffers from a serious medical need since there was no surgical pathology. In addition, they contend that a difference of

opinion regarding the course of treatment for his left hand does not amount to deliberate indifference.

According to Plaintiff, he started getting sharp pain in his left hand between the thumb and index finger in January of 2015. It was so bad he called a "man-down" and asked to be seen by a doctor on January 22, 2015. He saw a nurse, who said there was a possible broken vessel or pulled tendon.  On January 30, 2015, he saw Dr. Mar, who told Plaintiff there was not an issue with respect to the bump. He advised Plaintiff to cover his hand with a plastic bag before showering.

He had shock waves shooting up his arm, and wrote several kites for help. He saw Drs. Mar and Gedney and they told Plaintiff nothing was wrong. He saw a neurosurgeon, Dr. Vacca, but that was related to problems walking and numbness in both hands and there was no treatment or diagnosis as to the bump on the left hand. Plaintiff states that he still has problems moving his fingers without it sending shock waves up his arm.

In their motion, Defendants refer to Dr. Mar's response to an interrogatory regarding the treatment of Plaintiff's hand, where Dr. Mar stated: he saw Plaintiff on January 30 and February 13, 2015, for a bump on his left hand with pain to the forearm; the examination showed a prominent third "MCP joint" with a small mobile cyst between the second and third MCP joint; he had good mobility and circulation in his hand with a weak grip; he had pain in his neck; he was initially diagnosed with cervical pain with radiculopathy to the hand; Dr. Mar ordered x-rays of the left hand and films and an MRI of the cervical spine; labs were also ordered; Plaintiff was referred to neurosurgeon, Dr. Vacca; Plaintiff saw Dr. Gedney on May 7, 2015, and his hand x-ray and labs were normal; Dr. Gedney made no additional recommendations or further studies or changes to treatment; Dr. Mar stated that Plaintiff saw Dr. Vacca for his hands, and agreed there should be an MRI of the cervical spine, which showed no surgical pathology. (ECF No. 181 at 9.)

1    The argument asserted on behalf of Dr. Gedney is that she saw Plaintiff on May 7, 2015,

2  and the x-rays and labs were normal, so no additional recommendations for studies or treatment

3  were made. (ECF No. 181 at 10.)

4    Preliminarily, the court finds Defendants' argument that Plaintiff did not suffer from a

5  serious medical need to be unavailing. While the doctors may not have found surgery was

6  medically indicated, they did both note that prominent third MCP joint with a small mobile cyst

7  between the 2nd and 3rd MCP joint and prominent base of the proximal phalange, with pain

8  radiating to the forearm. The condition warranted getting labs and x-rays. Plaintiff continued to

9  kite about pain in this area well after he saw these providers. This undoubtedly constitutes a serious

10  medical need.

11    Next, the court finds that a genuine dispute of material fact exists as to whether Dr. Mar

12  and Dr. Gedney were deliberately indifferent to Plaintiff's serious medical need.

13    Plaintiff started complaining of pain related to the bump in between his fingers on the left

14  hand on January 22, 2015. He saw Dr. Mar initially on January 30, 2015, and then again on

15  February 13, 2015, and March 13, 2015. The first problem is that the medical records from those

16  dates that contain Dr. Mar's notes are essentially illegible. Second, Defendants refer to an

17  interrogatory response from Dr. Mar, but they do not produce the interrogatory and corresponding

18  response. Nor is there a declaration from Dr. Mar regarding his treatment of Plaintiff. In addition,

19  Defendants' argument, and Dr. Mar's interrogatory response are based on the premise that Plaintiff

20  was referred to Dr. Vacca for the pain from the bump in his left hand. Plaintiff, on the other hand,

21  claims that he did not see Dr. Vacca (the neurosurgeon) for pain from the bump in his left hand,

22  but saw him related to back/neck pain and numbness in both hands. The medical records that are

23  legible seem to correlate the visit with Dr. Vacca with Plaintiff's complaints of cervical spine/back

1   pain, and not the issue with the bump on the left hand. Defendants produce no records from

2   Dr. Vacca related to treatment for Plaintiff's left hand, or even for treatment of the cervical spine

3   and related pain.

4         There is also no declaration from Dr. Gedney. While her notes are more legible, they

5   indicated that Plaintiff was seen regarding multiple complaints including neuropathic pain

6   radiating down both legs, the bump between the base of the second and third fingers, and right

7   shoulder pain. (ECF No. 183-2 at 11.) The notes state that the x-ray of the left hand was normal,

8   and the bump he referred to was at the base of the proximal phalange. (*Id*. at 10.) In the assessment

9   and plan portion of the notes, Dr. Gedney stated that she talked to Plaintiff about his pain issues,

10  but did not differentiate between his different ailments or indicate any specific plan or discussion

11  regarding the bump on the left hand. On the other hand, Plaintiff says that both Dr. Mar and

12  Dr. Gedney told him it was nothing and ignored his continued complaints of pain. Dr. Gedney's

13  notes state that Plaintiff was on Neurontin and Baclofen, but the records seem to indicate he was

14  prescribed these medications in connection with other medical conditions.

15        Dr. Gedney did state he was not a surgical candidate, and had already been through back

16  surgery, but again, she did not indicate to what condition she was referring.  There is a note from

17  May 13, 2015, that states that the EMG (which in the May 7 note was of the lower extremities)

18  was normal; the neurosurgeon saw no need for further studies; and, the back was stable. (*Id*.) There

19  was nothing to indicate this was referring to treatment of Plaintiff's bump in the left hand, but

20  instead seems to refer to his back.

21        Defendants' argument that Plaintiff's condition was adequately addressed by Dr. Mar and

22  Dr. Gedney and the referral to Dr. Vacca is not sufficiently supported by the evidence. On the

23  other hand, Plaintiff presents evidence that the cervical spine/radiating pain was a separate

issue from the bump between the fingers of the left hand. Dr. Mar did order an x-ray, and while the x-ray of the hand may have been normal, Plaintiff continued to complain that he was still experiencing pain in connection with the bump on the left hand. In addition, Plaintiff might have been prescribed various medications during the same timeframe, but the records seem to reflect those medications were prescribed in the context of his other ailments, and it is not clear that his pain was adequately addressed insofar as the bump on the left hand was concerned.

Therefore, the motion for summary judgment should be denied as to the Eighth Amendment claim against Dr. Mar and Dr. Gedney in Count III related to the treatment of the bump on Plaintiff's left hand.

**4. Dr. Aranas**

Dr. Aranas argues that his only involvement in this claim was that he responded to the second level of grievance 20063000038. He advised Plaintiff he had been seen by multiple providers and a specialist who did not think surgery was indicated, and he was prescribed several pain medications. Dr. Aranas argues that the denial of a grievance does not give rise to liability.

Plaintiff argues that Dr. Aranas could have ordered Dr. Mar or Dr. Gedney to have Plaintiff seen by a specialist for his hand. Insofar as Dr. Aranas told Plaintiff he had seen a specialist, Plaintiff claims this is false. Plaintiff argues that no doctor has put in a referral for him to see a hand specialist, and the bump on his left hand is still hurting.

Preliminarily, Dr. Aranas is mistaken that responding to a grievance cannot give rise to liability under the Eighth Amendment. *See Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014). In this instance, however, Dr. Aranas' response did not violate the Constitution.

Dr. Aranas indicated that Plaintiff had been seen by many providers, who determined surgery was not medically necessary, and specifically instructed him that if he was still in pain he

should kite to be re-evaluated. There is a dispute of fact as to whether or not Plaintiff had been seen by a specialist related to the bump on his left hand and whether there had been any determination that surgery was not necessary with respect to the bump on the left hand. Even if Dr. Aranas' was mistaken as to those facts, he was not deliberately indifferent. He did not ignore Plaintiff's medical need, but instead advised Plaintiff that if he was still in pain, he should submit a kite to be re-evaluated. Therefore, summary judgment should be granted in favor of Dr. Aranas.

**D. Official Capacity Damages Claims**

Defendants are correct that Plaintiff cannot recover monetary damages from Defendants insofar as they are sued in their official capacities. *See Snow v. McDaniel*, 681 F.3d 978, 991 (9th Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003) ("[F]ederal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities[.]"). Plaintiff may proceed against defendants in their official capacity insofar as he seeks injunctive relief. Therefore, Defendants' motion for summary judgment should be granted insofar as Plaintiff seeks to recover damages against the remaining defendants in their official capacities.

**E. Status of Parties and Claims Following these Dispositive Motions**

After the court's recommendations on the dispositive motions, the status of the parties and claims proceeding is as follows:

**Count I:** (a) an Eighth Amendment deliberate indifference claim against Collins based on allegations that he withheld Plaintiff's medical diet lunches for a week at a time;  (b) a retaliation claim against Collins; (c) an excessive force claim against Collins.

**Count II**: an excessive force claim against Hightower.

**Count III:** (a) an Eighth Amendment deliberate indifference claim related to the bump on Plaintiff's left hand against Dr. Mar and Dr. Gedney; (b) an Eighth Amendment deliberate indifference claim related to treatment of Plaintiff's back which resulted in nerve damage and a "drop foot" against defendants Dr. Gedney, Dr. Mar and Dr. Aranas.

**Count IV**: a due process claim related to Plaintiff not being given a hearing regarding his STG designation against defendants Baca, Irvin and Walsh.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' Partial Motion for Summary Judgment (ECF No. 181) as follows:

(1) Defendants' motion should be **DENIED** as to the excessive force and retaliation claims against defendant Collins in Count I;

(2) Defendants' motion regarding the Eighth Amendment deliberate indifference to serious medical needs claim regarding treatment of the bump on Plaintiff's left hand in Count III should be **DENIED** as to Dr. Mar and Dr. Gedney, but **GRANTED** as to Dr. Aranas;

(3) Defendants' motion should be **GRANTED** insofar as Plaintiff seeks to recover monetary damages against defendants in their official capacities.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: May 21, 2019.

William G. Cobb
United States Magistrate Judge